# United States Court of Appeals
## For the First Circuit

Nos. 03-1668
     03-1697

GREENLAND SCHOOL DISTRICT,
Appellee, Cross-Appellant,

v.

AMY N., as parent and next friend of minor daughter, KATIE C.;
ROBERT N., as parent and next friend of minor daughter, KATIE C.,
Appellants, Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before
Lynch, Circuit Judge,
Campbell, Senior Circuit Judge, and
Lipez, Circuit Judge.

Scott F. Johnson, with whom Michael R. Chamberlain and Stein, Volinsky & Callighan were on brief, for appellants.
Jeanne M. Kincaid, with whom Jennifer D. Sawyer and Bernstein Shur, Sawyer & Nelson were on brief, for appellees.
Ronald K. Lospennato, with whom Wendy B. Paget was on brief, for amici curiae the Disabilities Rights Center, the New Hampshire Psychiatric Association, the Asperger's Association of New England, and the National Alliance for the Mentally Ill, New Hampshire.
Diane M. Gorrow, with whom Steven R. Sacks and Soule, Leslie, Kidder, Sayward & Loughman were on brief, for amici curiae the New Hampshire Association of Special Education Administrators, New Hampshire School Boards Association, and NEA-NH.

February 23, 2004

**LYNCH**, **Circuit Judge**. In 1997 Congress significantly amended the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 et seq. The 1997 Amendments, Pub. L. No. 105-17, 111 Stat. 37 (1997), reinforced the principle that children should not be removed unnecessarily from regular education environments, 20 U.S.C. § 1412(a)(5)(A), in part by eliminating "inappropriate financial incentives for referring children to special education." H.R. Rep. 105-95, at 90 (1997), reprinted in 1997 U.S.C.C.A.N. 78, 87. One specific purpose of the amendments was to control government expenditures for students voluntarily placed in private schools by their parents. See id. at 91-92.

At issue in this case is whether the parents of Katie C.[1] are entitled to reimbursement from the Greenland, New Hampshire School District for Katie's tuition at a private special-needs school, the Learning Skills Academy, for part of the fifth grade and all of the sixth grade. Katie's parents sought tuition reimbursement after having unilaterally removed Katie from Greenland Central School at the end of fourth grade and placed her in private school, without ever before raising with Greenland school officials the issue of special education services for Katie. The district court, reversing the due process hearing officer, held

---

[1]The captioned plaintiffs in this case, Amy N. and Robert N., are Katie C.'s parents.

-2-

that Katie and her parents were not entitled to such reimbursement. We affirm.

## I.

Katie, born in March 1990, started first grade at the Greenland Central School, a public school, in 1996. Although Katie was a good student, her first grade teacher noticed that she had difficulty focusing on classroom activities and was easily distracted. During the summer after first grade, Katie's parents, Mr. and Mrs. N., took Katie to a private psychologist who diagnosed her with Attention Deficit Hyperactivity Disorder (ADHD). The psychiatrist suggested several practical steps that Katie's teachers could take to counteract her ADHD, including providing her with a checklist of tasks to complete and seating her in the front of the classroom.

Katie's second, third, and fourth grade teachers each used techniques similar to those recommended by Katie's psychiatrist to help Katie stay on task. They sat Katie in the front of the classroom, provided her with a checklist of items she was to complete, and maintained frequent contact with Mrs. N. about Katie's performance. Some of her teachers also employed basic behavior modification techniques to help improve Katie's concentration, such as providing incentives for Katie with stickers. Katie's teachers frequently used these and similar methods to help other students focus too.

Mrs. N., who is herself a special education teacher at a nearby high school, also spent a considerable amount of time helping her daughter with her schoolwork. She spent 2-3 hours a night helping Katie with her homework in second grade and provided 3-4 hours of assistance each night in the third grade. By the time Katie was in fourth grade, her parents had hired a tutor to meet with her twice a week.

Katie's academic performance during her four years at Greenland ranged from average to above-average. In second grade, Katie was grouped with students who had good reading skills, although she had some difficulties with math. Her second grade teacher viewed Katie as a "competent learner" and Katie received a passing grade in all of her subjects.[2] Katie continued to perform reasonably well in third and fourth grades, earning mostly A's and B's on her report card. Katie's third grade teacher viewed her as "very bright" and a "good learner" and her fourth grade teacher said her academic performance was "between an eight and a nine" on a ten-point scale.

Katie's academic marks were consistent with her scores on the California Achievement Test, a national standardized test that Katie took in the second and fourth grades. On both administrations of the test, Katie scored in the average to above-

---

[2]Second grade students at Greenland do not receive a letter or number grade, but instead simply "pass" or "fail."

average range on all of the tested subjects.  She also received an average score on all subparts of the New Hampshire End of Grade 3 Assessment, another standardized test.

Throughout her time at Greenland, though, Katie still occasionally had difficulty maintaining her concentration on discrete tasks.  She also had problems making friends and was sometimes teased by her classmates.  In Katie's fourth grade year, Mrs. N. became sufficiently concerned about peer harassment that she contacted Katie's teacher.

At no point during Katie's time at Greenland did her parents or any of her teachers request that she be evaluated for special education services.  Katie's second grade teacher noted that Katie did not meet the general profile of a special education student because there was not a gap between her apparent learning ability and her academic performance.  Similarly, her third grade teacher said that Katie's difficulties with paying attention were concerns for her physician and that she did not believe that Katie required special education services.

In August of 2000, the summer that Katie completed fourth grade, Katie's parents unilaterally removed her from the Greenland Central School and enrolled her in Mont Blanc Academy.  Mont Blanc Academy is a private school that does not focus on special education students and, when Katie's parents enrolled her there, they "weren't looking for special education."  When Katie started

fifth grade at Mont Blanc, the school instructed Mrs. N. not to help Katie with her homework. As a result, Katie struggled with some of her classes and failed her first quarter math class, although she passed her other classes. In November, after Mrs. N. learned of Katie's failing math grade, she resumed helping Katie with her homework and Katie's math grade rose to a B.

For reasons unspecified in the record, Mont Blanc Academy requested in February of 2001 that Katie's parents withdraw her from the school. One month later, in March of 2001, Katie's parents enrolled her at the Learning Skills Academy (LSA) for the remainder of her fifth grade year. LSA is a private school that has only about thirty enrolled students, most of whom either suffer from a learning disability or ADHD. Tuition for Katie's spring term at LSA was $16,000.

At approximately the same time that Katie started at LSA, Mrs. N. contacted Melanie Lovering, the special education coordinator for Greenland Central School, and requested that Katie be evaluated by the psychologist on call with the school, Dr. Secor. This was the first time that Katie's parents had notified Greenland that Katie might need special education services. Mrs. N., being a special education teacher and administrator herself, was familiar with the processes associated with identifying children who require special education. Katie's parents told Greenland that their major concerns with Katie's development were

-6-

focused on "written language, organization and hyperactivity."  The school responded by scheduling a "disposition of referral meeting"[3] to take place about two weeks later, on April 6, 2001.

At the April 6 meeting, three Greenland special education teachers, two representatives from LSA, an occupational therapist, Dr. Secor, Ms. Lovering, and Mrs. N. all met to discuss Katie's eligibility for special education services at Greenland.  The group agreed that they did not at that point have sufficient information to determine whether Katie should be coded as learning disabled.  Accordingly, they planned a battery of tests and evaluations that Greenland school officials would conduct over the next several weeks to gather more information on Katie's strengths and weaknesses.  These included multiple standardized tests in math and written expression and, at Mrs. N.'s request, various psychological assessments by Dr. Secor.

On May 23, 2001, the school district held a meeting with Mrs. N. to assess the results of Katie's tests and evaluations and determine whether Katie was eligible for special education services at Greenland.  The school officials in attendance, including Dr. Secor, Ms. Lovering, and four others, unanimously determined that even though Katie had ADHD and an anxiety disorder, those conditions did not adversely affect her educational performance.

[3]A "disposition of referral meeting" is a procedure used by Greenland following a request to determine whether a particular child is eligible for special education services.

They also unanimously concluded that Katie did not have a learning disability because there was no evidence of a discrepancy between Katie's ability and her achievement. The officials nonetheless agreed to offer Katie a plan to address some of her organizational weaknesses.

In a letter dated May 29, 2001, Katie's parents informed Michelle Langa, the assistant superintendent of the Greenland School District, that they disagreed with the district's decision finding Katie ineligible for special education services. The letter informed the district that Mr. and Mrs. N. had scheduled an appointment with an independent psychiatrist named Dr. Spitzer, but it did not request any specific further action on the part of Greenland. Again, at the time Katie's parents sent this letter in May 2001, Katie was already in private school, having been withdrawn from public school in August 2000.

Dr. Spitzer evaluated Katie in May and sent a letter to Michelle Langa on August 15, 2001 detailing her conclusions. Dr. Spitzer confirmed Katie's diagnosis of ADHD, but she also concluded that Katie suffers from Asperger's disorder. Asperger's disorder is a developmental disability on the autism spectrum that is associated with significant misperceptions of otherwise routine elements of daily life. It is a permanent condition that is not treatable with medication.

Meanwhile, Katie's parents decided to re-enroll Katie in LSA for sixth grade, the 2001-2002 school year. Katie had done well at LSA during the spring semester of her fifth grade year, making significant strides in her academic and emotional development. She no longer relied on her mother to assist her with her homework, developed positive peer relationships, and was a "much more confident, happier child."

On September 12, 2001, as Katie was starting sixth grade at LSA, Greenland school officials met with Dr. Spitzer to review her conclusion that Katie suffered from Asperger's disorder. Although Dr. Secor, who also attended the meeting, disputed this diagnosis, the team decided to reverse its earlier determination that Katie did not qualify for special education services. Rather than code Katie as "autistic," consistent with the diagnosis of Asperger's disorder, the team agreed to code her as "other health impaired."

Over the next several months, school officials met several times with Mrs. N. and her advocate to develop an Individual Education Plan (IEP) that would provide Katie with appropriate special educational services at Greenland. Throughout this process, Katie remained a student at LSA. By mid-November, the team of school officials, in conjunction with Mrs. N. and her advocate, had developed a working draft of Katie's initial IEP. The draft provided for Katie to re-enroll in Greenland public

school and have a personal aide who would assist her with "social pragmatic skills across a variety of settings and partners" and help develop her "graphing and discourse skills."

On November 15, 2001, as the final details of Katie's IEP were being worked out, Katie's parents filed a due process hearing request. The letter requesting the hearing indicated that Katie's parents appreciated the school's efforts in drafting an IEP for Katie, and explained that they were seeking reimbursement for Katie's tuition at LSA and were concerned that the time for filing a hearing request would soon expire. Although surprised and confused by the due process hearing request, school officials completed the final version of Katie's IEP several weeks later. In addition to providing Katie with services at Greenland, including her own aide, the plan set forth a curriculum to help Katie learn the difference between friendly joking and hurtful teasing, a problem with which children suffering from Asperger's disorder have particular difficulty. It also included counseling services for Katie and speech/language services that Dr. Spitzer had recommended. Even after Greenland completed the IEP, Katie remained enrolled at LSA instead of returning to Greenland and receiving the services outlined in the IEP.

A. <u>Administrative Proceedings</u>

In response to Mr. and Mrs. N.'s due process hearing request, the hearing officer held a prehearing conference on January 15, 2002. At that conference, the parents said that, in addition to seeking reimbursement, they were challenging the school district's failure to identify Katie as eligible for special education services in May of 2001 (when she was a student at LSA). The parents also indicated that they were dissatisfied with the plan that Greenland had developed in the Fall of 2001 to educate Katie at Greenland because, despite its reliance on an aide to assist Katie, no such aide had been hired.

The hearing officer heard testimony from sixteen witnesses over three days and issued a decision on February 20, 2002. The decision rejected Greenland's argument that it was not obliged to develop an IEP for Katie because she was unilaterally placed in a private school by her parents; it concluded that Greenland had to offer Katie an IEP pursuant to its "child find" obligations. The decision also found that Greenland had erred when in May 2001 it failed to find Katie eligible for special education services. Reasoning that Katie was in effect receiving specialized education throughout her time at Greenland, the hearing officer concluded that the team's reliance on the lack of an apparent gap between Katie's ability and her performance was legally deficient.

The hearing officer also concluded that Katie would be ill-served by returning to Greenland. He found that Greenland did not have any aide or staff with whom it could place Katie if she were to return to the school and that, even if an aide existed, Greenland's proposed IEP would not provide Katie with a Free Appropriate Public Education (FAPE). Based on these conclusions, the hearing officer ordered Greenland to reimburse Mr. and Mrs. N. for Katie's tuition at LSA for both the second semester of her fifth grade year and the entirety of her sixth grade year. This amounted to $48,000.

## B. District Court Decision

Pursuant to 20 U.S.C. § 1415(i)(2), the school district challenged in district court the hearing officer's decision. The district court reversed the bulk of the hearing officer's holdings, concluding that the hearing officer had incorrectly considered the adequacy of the IEP offered by Greenland and the availability of tuition reimbursement. The district court found that Katie was enrolled in private school (Mont Blanc Academy) before her parents ever raised the question of special education and that FAPE was not "at issue" when Katie was removed from Greenland. On this basis, the district court concluded that the hearing officer had only the statutory authority to consider whether Greenland had violated its "child find" obligation. 34 C.F.R. § 300.451.

-12-

The court affirmed the portion of the hearing officer's opinion that concluded the school district erred in failing to code Katie as a child with a disability in May 2001. Construing that portion of the opinion as stemming from the school district's "child find" obligation, the court determined that the hearing officer had the authority to consider the issue. After reviewing the hearing officer's decision on the merits, the court affirmed. Because the district court denied reimbursement on other grounds, this ruling did not affect the plaintiffs' claim for relief.

Katie's parents appeal the portion of the district court's opinion reversing the hearing officer's determinations. Greenland School District cross-appeals, arguing that the district court incorrectly affirmed the hearing officer's determination that Katie should have been coded as a child with a disability in May 2001.

**III.**

Our review is de novo, as this case only presents questions of law. Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st Cir. 2002).

New Hampshire implements IDEA through its special education law. N.H. Rev. Stat. Ann § 186-C. The state has adopted by reference the federal regulations as to special education for disabled students in private schools. N.H. Code Admin. Rules, Ed. 1117.03 (2003). Thus, Katie's rights under New Hampshire law are

the same as her rights under federal law and no greater.  See Gary S. v. Manchester Sch. Dist., 241 F. Supp. 2d 111, 122-23 (D.N.H. 2003).

This case turns on the 1997 IDEA Amendments.  Those amendments affect this case in three ways.  First, the amendments make clear that while local school systems have "child find" obligations as to students with disabilities in private schools, they do not have to provide such students with the full complement of services that a student in public school with special needs would receive.  See 20 U.S.C. § 1412(a)(10)(A);  34 C.F.R. § 300.454(a)(1) ("No private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.").  Second, they establish that complaints about the services a disabled student in private school is receiving after he or she has been identified must be brought through the state administrative complaint system rather than a due process hearing. 34 C.F.R. § 300.457 (a), (c).  Finally and most importantly, the amendments limit the circumstances in which parents who have unilaterally placed their child in a private school are entitled to reimbursement for that placement.  See 20 U.S.C. § 1412(a)(10)(C).

A.  Obligation to Provide Services to Disabled Private School Children and the Proper Forum for Such Claims.

The district court vacated the hearing officer's evaluation of the IEP that Greenland offered to Katie because it

-14-

concluded that this issue was not properly before the hearing officer. That ruling was correct.

Because Katie was enrolled at LSA, a private school, when she filed her due process hearing request, her rights under IDEA are governed by 20 U.S.C. § 1412(a)(10). That subsection divides children in private school into two categories: (1) children enrolled in private schools by their parents, and (2) children placed in or referred to private schools by public agencies. See id. § 1412(a)(10) (A), (B). It is undisputed that Katie falls in the former category, as she was not placed in or referred to Mont Blanc or LSA by a public agency.

Participating school districts such as Greenland owe children who fall within subsection (A) of § 1412(a)(10) a "child find" obligation. See § 1412(a)(10)(A)(ii). This obligation requires those districts to "locate, identify and evaluate all private school children with disabilities" using methods that are "comparable to activities undertaken for children with disabilities in public school." 34 C.F.R. § 300.451(b). In the event that a district fails to meet its "child find" obligations, a child's parents can initiate a due process hearing under the procedures outlined in §§ 300.504-300.515. See id. § 300.457.

Importantly, IDEA also provides that participating districts must provide certain services to disabled children in private school once those children have been identified through the

child find process.  See id. §§ 300.452 - 300.462.  These services are, not surprisingly, less extensive than the services that a disabled child enrolled in public school is entitled to receive. Not only are the services provided to students in these two settings different in scope, but the procedure for review of claims of a denial of services is also different.  Parents of disabled children voluntarily enrolled in private school cannot initiate a due process hearing if they feel their child is not receiving the services required by IDEA.  See id. § 300.457(a).  Rather, such parents must proceed through an alternative procedure within the state's administrative apparatus.  See id. § 300.457(c).  As the comments to the draft of the regulations explain:

> While there may be legitimate issues regarding the provision of services to a particular parentally-placed private school child with disabilities [that a local education agency] has agreed to serve, due process should not apply, as there is no individual right to these services under the IDEA.  Disputes that arise about these services are properly subject to the State complaint procedures.

64 Fed. Reg. 12406, 12605 (March 12, 1999).

As the district court recognized, any complaints that Katie's parents had regarding Katie's IEP in the fall of 2001 should have been brought through the state complaint process.  The adequacy of the IEP was not an appropriate subject for the due process hearing because it had nothing to do with Greenland's child find obligation.  Once Greenland identified Katie as a child with a disability in September 2001, the district had performed every

-16-

act reviewable by a hearing officer; any subsequent obligations it had to provide educational services to Katie were matters for the state administrative procedure, which would apply different standards to evaluate the services provided than did the due process hearing officer. See 34 C.F.R. § 300.457(c) (question in state administrative procedure is whether the district met its obligations under §§ 300.451-300.462). That decision, moreover, would not be appealable to federal court. See Vultaggio v. Bd. of Educ., 343 F.3d 598, 601 (2d Cir. 2003).

B. Tuition Reimbursement for Students Unilaterally Placed in Private Schools[4]

The substantive question in this case is whether Katie's parents were eligible for tuition reimbursement and, if so, whether it was an abuse of discretion for the district court to deny reimbursement for either Katie's fifth or sixth grade school year.[5] We affirm the district court's determination on the ground that Katie's parents were ineligible for reimbursement.

Until 1985, there was some uncertainty about whether the remedy of reimbursement for private school tuition was available

---

[4]Katie's parents do not make a claim for compensatory services for past inadequacies. Cf. Maine Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 17-18 (1st Cir. 2003) (discussing such claims).

[5]This issue was properly before the hearing officer on Katie's parents' due process request. See 34 C.F.R. § 300.403(b) ("Disagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and the question of financial responsibility, are subject to the due process procedures of §§ 300.500-300.517.").

when a school district had failed to provide appropriate services to a disabled child in the public school. IDEA itself only authorized the district court to "grant such relief as [it] determine[d] is appropriate." 20 U.S.C. § 1415(e)(2) (1984), recodified as amended 20 U.S.C. § 1415(i)(2)(B). In Burlington v. Dep't of Educ., 471 U.S. 359 (1985), the Supreme Court held that this clause authorized the equitable remedy of tuition reimbursement. See id. at 369. It noted that the broad language of the statute vested courts with significant discretion to craft appropriate remedies and that, in cases where it would take a significant amount of time for the school to offer appropriate services, the Act's promise of a free appropriate public education could justify the remedy of reimbursement for private school tuition. Id. at 370. The Court also found that tuition reimbursement was available even in some instances when parents had unilaterally removed their child from public school. Id. at 372.

Uncertainty about the circumstances under which tuition reimbursement was available remained even after Burlington. Before the 1997 IDEA amendments, several circuits had held that reimbursement for private school tuition depended on the parents cooperating with school authorities in determining the proper placement and educational plan for the child. See Patricia P. v. Bd. of Educ., 203 F.3d 462, 468 (7th Cir. 2000) (listing cases interpreting pre-amendment IDEA). As one court noted, "parents

-18-

who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placement." Id. at 469. Although few courts precisely defined the level of cooperation necessary, most thought it clear that, at a minimum, the parents had to inform the school district of their concerns about their child's special needs and about the plan proposed before removing the child from public school. See Berger v. Medina City Sch. Dist., 348 F.3d 513, 523 (6th Cir. 2003) ("Even before the IDEA was amended to explicitly require such notice, this court held that dissatisfied parents were required to complain to the public school to afford the school a chance to remedy the IEP before removing their disabled child from the school."); M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 (2d Cir. 2000) ("[C]ourts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP."); Ash v. Lake Oswego Sch. Dist., No. 7J, 980 F.2d 585, 589 (9th Cir. 1992); Evans v. District No. 17, 841 F.2d 824, 829 (8th Cir. 1988).

The 1997 Amendments endorsed this line of cases and helped clarify the amount of parental cooperation required by adding a section to IDEA entitled "Payment for education of children enrolled in private schools without consent of or referral

-19-

by the public agency." 20 U.S.C. § 1412(a)(10)(C); see H.R. Rep. 105-95, at 93, reprinted in 1997 U.S.C.C.A.N. 78, 90. See generally Gary S., 241 F. Supp. 2d at 114-15. That section begins with a general statement of policy explaining that IDEA does not "require a local education agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i). This provision, taken by itself, might be considered ambiguous as applied to a situation where, as here, the local education agency was never informed while the child was in public school that the child might require special education services. But this seeming ambiguity disappears when considered in light of the section's affirmative requirement that "the parents of a child with a disability, who previously received special education and related services under the authority of a public agency" can receive reimbursement for their unilateral placement of the child in private school only "if [a] court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." Id. § 1412(a)(10)(C)(ii).

These threshold requirements are key to this case: tuition reimbursement is only available for children who have

-20-

previously received "special education and related services"[6] while in the public school system (or perhaps[7] those who at least timely requested such services while the child is in public school). There is no dispute that neither Katie's parents nor anyone else requested an evaluation for Katie while she was at Greenland. There is also no dispute that she was removed from Greenland for reasons having nothing to do with any issue about whether Katie was receiving FAPE. Whether some of the techniques used for Katie in the regular classroom (such as the use of checklists) may also be techniques used in special education is beside the point. The point is that there was no notice at all to the school system

---

[6]The full text of § 1412(a)(10)(C)(ii) is:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

[7]Despite the language of the statute, some legislative history suggests that Congress meant to include children who had requested but not yet received special needs services during their period in the public schools. See H.R. Rep. 105-95, at 91-93, reprinted in 1997 U.S.C.C.A.N. 78, 89-90. That issue does not need to be resolved in this case, as Katie's parents never requested special education services for Katie while she was at Greenland.

before Katie's removal from Greenland that there was any issue about whether Katie was in need of special education.

Even for children who received special education services in the public schools before the private school placement, the 1997 Amendments implemented several additional limitations on reimbursement. Those limitations reinforce our conclusion that Katie and her parents are not eligible for tuition reimbursement. The statute provides that reimbursement may[8] be denied or reduced if the parents do not give the school district notice of their intent to remove their child from public school before they do so. Id. § 1412(a)(10)(C)(iii)(I); see Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 27 (1st Cir. 2002). That notice can be provided either "at the most recent IEP meeting that the parents attended prior to removal of the child from the public school" or by written notice ten business days prior to such removal. 20 U.S.C. § 1412(a)(10)(C)(iii)(I). The statute also creates exceptions to this notice requirement, such as when the parents are illiterate or the child will face physical or serious emotional harm by providing notice. Id. § 1412(a)(10)(C)(iv). None of those exceptions is presented here.

---

[8]There may be extreme cases where it is obvious to a school that a child is a special needs child but the school fails to inform parents, who are ignorant of their rights under IDEA. Whether this situation would warrant an exception to the general rule as an exercise of equitable jurisdiction is something we need not address.

These statutory provisions make clear Congress's intent that _before_ parents place their child in private school, they must at least give notice to the school that special education is at issue. This serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools. See Patricia P., 203 F.3d at 468; Schoenfeld v. Parkway Sch. Dist., 138 F.3d 379, 381-82 (8th Cir. 1998); cf. Burlington, 471 U.S. at 373 (discussing the importance of reviewing a child's educational needs while the child is in the regular public school classroom).

Reading IDEA as plaintiffs propose would destroy those safeguards. Here, the parents, well acquainted with IDEA, gave no notice that Katie might need special education services. Indeed, they were not even looking for such services when they removed Katie from public school. Several courts, relying on the parents' failure to challenge the IEP's adequacy, have found insufficient notice to the school district even when the parents requested an evaluation and received an IEP before removing their child. See, e.g., Berger, 348 F.3d at 523-24 (affirming a denial of reimbursement when the child's parents agreed to the IEP proposed by the school and only informed the school district of their concerns after they arranged for the child's enrollment in private

-23-

school); see also M.C., 226 F.3d at 68 (denying reimbursement for psychological counseling that the court assumed necessary for the child to benefit from special education because the parents had failed to raise the issue in the child's IEP before the counseling started).  If the parents' conduct provided inadequate notice in these cases, then there was clearly insufficient notice here, where the parents never even raised the issue of special education before removing Katie from Greenland.[9]

The regulations promulgated under IDEA, to which we must give deference, Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 892 & n.9 (1984), are consistent with our reading of the statute. For the most part, the regulations provide little additional guidance in interpreting the statute because they merely repeat the statute's language.  Compare, e.g., 20 U.S.C. § 1412(a)(10)(C), with 34 C.F.R. § 300.403.  However, the regulations do provide one interpretive clue by organizing the statutory provisions dealing with reimbursement under the heading "Children with Disabilities

---

[9]Katie's parents rely on James ex. rel. James v. Upper Arlington City School Dist., 228 F.3d 764 (6th Cir. 2000), for the proposition that they should not be required to re-enroll Katie in the Greenland schools to reestablish her legal rights to an appropriate educational program.  However, James concerned events before the 1997 Amendments and also involved the refusal by the school system to do an IEP evaluation before enrollment of the child in private school.  Id. at 768. That issue is not involved here.  In fact, in this case there were no disagreements, due process hearing requests, or administrative review proceedings ongoing at the time Katie was removed from the public schools, so the "stay put" provisions of IDEA, 20 U.S.C. § 1415(j), are not at issue, unlike in James.

-24-

enrolled by their parents in private school when FAPE is at issue." See 34 C.F.R. § 300.403 (emphasis added). This formulation indicates that the Department of Education views notice as critically important in the statutory scheme: it is difficult to imagine FAPE being "at issue" when neither the school nor the child's parents have ever raised the question of FAPE. Even more than the statute, the regulations suggest that a child like Katie who is removed from her school without her parents or her school ever questioning the availability of FAPE is not within the category of children eligible for tuition reimbursement.

Katie's parents argue that even if they did not give sufficient notice to Greenland for Katie's fifth grade year, they did provide sufficient notice that Katie would be attending LSA by the time of her sixth grade year. Although Greenland was certainly aware that Katie might be attending LSA for the fall semester of her sixth grade year, that fact is beside the point. The purpose of the notice requirement is to give public school districts the opportunity to provide FAPE before a child leaves public school and enrolls in private school. See Patricia P., 203 F.3d at 468 (emphasizing the importance of cooperation between parents and the school district before the child is removed from public school); Schoenfeld, 138 F.3d at 381-82 (same); Town of Burlington v. Dep't of Educ., 736 F.2d 773, 799 (1st Cir. 1984) (noting the distinction "between a unilateral parental transfer made after consultation

with the school system . . . and transfers made truly unilaterally, bereft of any attempt to achieve negotiated compromise and agreement"), aff'd, 471 U.S. 359 (1985).  Once a child's parents have unilaterally removed the child from public school, subsequent notice almost a year after removal does little good.

As the Supreme Court warned almost twenty years ago, "parents who unilaterally change their child's placement . . . without the consent of state or local school officials, do so at their own financial risk."  Burlington, 471 U.S. at 373-74.  This case demonstrates that the Court's admonition remains no less true today.

The district court also reached the issue whether Katie should have been classified as a special needs student in May 2001. Given our conclusion that tuition reimbursement is unavailable due to the parents' lack of notice to the school system while Katie was enrolled there, the issue whether Greenland should have coded Katie as disabled in May 2001 is of no moment to this case.

In fact, the analysis that would be required if we reached that issue is both difficult and sensitive.  Very helpful amicus briefs, taking opposing views, have been submitted by the New Hampshire Association of Special Education Administrators, the New Hampshire School Boards Association, and NEA-NH on behalf of Greenland, and by the Disabilities Rights Center, the New Hampshire Psychiatric Association, the Asperger's Association of New England,

and the National Alliance for the Mentally Ill on behalf of Katie's parents. These briefs point out the complications involved in determining whether any child should be coded as a special needs child on a particular date. They also discuss the concern that admirable techniques used in general education can be bootstrapped into supporting a special education finding and the converse danger that the identification of special needs students will be hidden behind the veil that all students receive some individualized training. Each side argues that an interpretation going against its position would undercut the provision of services to students in need. This is an extremely important and nuanced question of law that we leave for another day.

## IV.

**<u>Affirmed</u>**. Costs are awarded to Greenland.