# United States Court of Appeals

## For the First Circuit

No. 03-2035

MS. M., as parent and next friend of K.M., a minor,

Plaintiff, Appellant,

v.

PORTLAND SCHOOL COMMITTEE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Richard L. O'Meara, with whom Amy N. Sneirson and Murray, Plumb & Murray were on brief, for appellant.
Eric R. Herlan, with whom James C. Schwellenbach and Drummond Woodsum & MacMahon were on brief, for appellee.

March 9, 2004

**LYNCH**, <u>Circuit Judge</u>.   Ms. M., the parent of K.M., brought suit seeking reimbursement from the Portland, Maine school district for K.M.'s sixth grade tuition for the 2001-2002 school year at the Aucocisco School, a private school.  She claims that the Portland school district provided K.M., who suffers from Attention Deficit Hyperactivity Disorder (ADHD), with an inadequate sixth grade Individualized Educational Plan (IEP) under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 <u>et seq.</u>  Ms. M., in a second argument, also seeks to re-characterize her tuition reimbursement claim as one for compensatory education for the allegedly deficient educational services provided to her son under the IEPs during his fourth and fifth grade years at the Longfellow School, a public elementary school in the Portland school district.

Parents who unilaterally remove their child from public school because they believe that the special education services provided for the child are inadequate are entitled to tuition reimbursement for the costs of the private school placement under some circumstances.  Under the 1997 Amendments to IDEA, such parents generally should give prior notice to the school system of their rejection of the proposed IEP and their intent to enroll their child in a private school at public expense, or, failing that, must meet one of the four exceptions to the notice requirement.  20 U.S.C. § 1412(a)(10)(C)(iii) & (iv).  Here, the

-2-

notice requirement was not met, but Ms. M. claims that she falls within two different exceptions -- one involving illiterate parents and the other involving the school system's failure to meet its own notice obligations.  Id. § 1412(a)(10)(C)(iv)(I) & (IV).  The due process hearing officer found as a matter of fact that Ms. M. did not come within either exception and so denied the claim for tuition reimbursement.  The hearing officer did allow her to receive reimbursement for the costs of an evaluation and tutoring during K.M.'s fifth grade year; those costs are not at issue.  On appeal by Ms. M. from the hearing officer's adverse tuition reimbursement holding, the district court agreed with the hearing officer that she was not entitled to tuition reimbursement because she had failed to give notice and that failure was not excused.  We too agree and affirm.

## I.

The facts, which are largely undisputed, are taken from the district court's opinion and supplemented from the record.

In 1995, Ms. M. enrolled her son, K.M., at Longfellow School.  K.M. had completed his kindergarten year at his previous school, but repeated it at Longfellow because he exhibited significant speech, language, and attentional deficits.  In his second year at Longfellow, while he was in first grade, K.M.'s teacher became concerned that K.M. was still making inadequate progress and referred him to a pupil evaluation team (PET).  That

team consisted of K.M.'s mother and grandparents, K.M.'s teacher, the principal of Longfellow school, a psychological examiner, a special educator, and a speech therapist. The PET identified a large gap between K.M.'s intellectual abilities and his academic performance and concluded that K.M. suffered from a learning disability and was eligible for special education services.

The PET developed an IEP for K.M.'s second grade year, which provided for K.M. to be taught in a regular classroom and to receive eight hours a week of supplemental special education services. Over the course of the next few years, the PET gradually increased the amount of special education services that K.M. received: his third grade IEP provided for eleven hours of special education support a week, his fourth grade IEP for fourteen hours a week, and his fifth grade IEP for nineteen hours a week.

Despite the school's focus on his learning problems, K.M. continued to struggle academically throughout his time at Longfellow. In third grade, a learning strategist observing K.M. in the classroom noted that K.M. had difficulty with reading skills and needed direct instruction. His tutor concluded that, at the end of third grade, K.M.'s reading "comprehension was greatly limited" and K.M. was "an initial [stage] reader." At the start of K.M.'s fourth grade year, the school determined that K.M.'s reading and writing skills remained only at first and second grade levels. It also found that K.M. had delayed language and phonological

-4-

processing skills.  Later that year, K.M. failed to meet three of the five benchmarks on a Maine standardized test, and only partially met the other two.

In November of 2000, during K.M.'s fifth grade year, Ms. M. and her brother, Tom L., presented the PET with a written statement of concerns about K.M.'s progress; Ms. M. was assisted by her brother because she suffers from a learning disability similar to her son's.  Following the meeting, Ms. M. obtained the assistance of Donna Verhoeven, an educational advocate with the Disabilities Rights Center in Maine, who supplemented Ms. M.'s earlier list of concerns with a written request for a publicly funded independent evaluation of K.M.  The PET reconvened in January 2001, and again in February, to discuss Ms. M.'s concerns. The PET, which included Ms. M., Tom L., and Donna Verhoeven, decided to increase K.M.'s special education services to over twenty hours a week, provide him with homework assistance at 8 a.m. (before school started), and start planning educational services for K.M. over the summer.  The team also agreed to have K.M. independently tested by Dr. Slap-Shelton, a psychologist, as Ms. M. had requested.  Finally, the PET briefly discussed the educational services that would be provided to K.M. in his sixth grade year.

On May 1, 2001, Ms. M. completed an application to enroll K.M. at Aucocisco, a private school for learning disabled children. About one week later, Ms. M., along with Tom L. and Donna

Verhoeven, attended a PET meeting at Longfellow. At the meeting, Dr. Slap-Shelton presented her evaluation of K.M. She explained that K.M. suffered from dyslexia and "soft signs" of ADHD and made numerous recommendations for improving K.M.'s IEP. After lengthy discussion of Dr. Slap-Shelton's conclusions, the PET agreed on six goals for K.M.'s upcoming sixth grade year. At no time in this period did the plaintiff notify the school system that she was considering a private placement. Nor did she disagree with the PET's work to date.

The group met again on June 13 and, after lengthy discussion, finalized the details of K.M.'s sixth grade program. Once again, Ms. M. did not indicate to any other members of the PET that she was considering removing K.M. from public school. Ms. M. expressed some concerns about the proposed IEP plan, but she neither approved nor rejected it. Rather, she indicated her desire to continue discussions about improving the IEP. The other PET members agreed to reconvene in early September. Nonetheless, action was taken over the summer. Barbara Dee, the school's director of special education, testified that she contacted Ms. M. in July to schedule a date for a summer PET meeting and Ms. M. said that, while she was willing to meet in the summer, she needed to check with her brother and advocate about a date and would call Dee back. Ms. M. never called back. In August, not having heard from Ms. M., Dee again called to schedule a PET meeting, this time

leaving a message on Ms. M.'s answering machine with several possible dates over the summer. Again, Ms. M. did not return the call. Ms. M. disputes that there was an offer for a PET meeting, but her lack of memory does not make the district court's contrary findings clearly erroneous.

On July 2, Portland sent Ms. M. the minutes of the June PET meeting and the proposed IEP for K.M.'s sixth grade year. Ms. M. concluded that the proposed IEP was inadequate and decided unilaterally to enroll K.M. in Aucocisco. But she did not notify the school system of her disagreement. By August 17, Ms. M. had made the initial deposit to Aucocisco for tuition. She did not inform any Longfellow school official of her choice.

In a handwritten letter dated September 11, 2001, Ms. M. informed the school that she found the IEP unsatisfactory, that K.M. was attending the Aucocisco school, and that no more PET meetings would be necessary. This was the first time that anyone in the Portland public school system became aware that Ms. M. was removing K.M. from public school, and the first notice to Portland of outright rejection of the IEP.

On November 20, 2001, Ms. M. informed the Portland school district that she intended to seek reimbursement for K.M.'s Aucocisco tuition. Over the period of the next few months, Ms. M. met with the other PET members several times to determine whether they could agree on an IEP that would provide K.M. with a suitable

education in public school. Ms. M. and the school district were unable to reach an agreement on the matter, and on March 13, 2001, the school district requested a due process hearing, 20 U.S.C. § 1415 and Me. Rev. Stat. Ann. tit. 20-A, § 7207-B, arguing, inter alia, that it was not responsible for K.M.'s tuition at Aucocisco. Ms. M. responded that the school district had failed to provide K.M. with a free appropriate public education (FAPE), and was responsible not just for his tuition at Aucocisco, but also for compensatory education stemming from alleged deficiencies in K.M.'s fourth and fifth grade education.

On June 10, 2002, after hearing testimony from twelve witnesses, the hearing officer denied Ms. M. tuition reimbursement. She reasoned that under 20 U.S.C. § 1412(a)(10)(C)(iii), Ms. M. did not provide the school district with sufficient notice of her intent to remove K.M. from public school.[1] She also found that Ms. M. did not fit within any of the exceptions to the statute's notice provision. 20 U.S.C. § 1412(a)(10)(C)(iv). Ms. M., she concluded, was not illiterate within the meaning of the statute and had been provided with adequate notice of her own obligation to provide prior notice before removing K.M. from public school. The hearing officer did, however, grant Ms. M. compensation for the costs of

---

[1]The hearing officer also found that the IEP proposed for K.M.'s sixth grade year was reasonably calculated to provide K.M. with FAPE. Because we decide the reimbursement issue on the ground of insufficient notice, we do not review this holding.

the evaluation performed by Dr. Slap-Shelton and for the costs of certain tutoring services provided to K.M. in fifth grade.

## II.

Ms. M. brought suit in Maine Superior Court challenging the hearing officer's decision, 20 U.S.C. § 1415(i)(2)(A) and Me. Rev. Stat. Ann. tit. 20-A, § 7207-B(2)(B), and the school district removed the case to federal court, 28 U.S.C. § 1441(b). The district court affirmed the hearing officer's decision, adopting the magistrate judge's recommended findings of fact and conclusions of law. The district court opinion rejected the argument that the hearing officer had erred in concluding that Ms. M. did not fit within any of the exceptions to the notice requirement.[2] It found that the hearing officer was correct that Ms. M. was not illiterate and had received a procedural-safeguards notice from the school explaining IDEA's notice requirement. The district court opinion also rejected Ms. M.'s claim for tuition reimbursement as a form of compensatory education for K.M.'s allegedly deficient fourth and fifth grade education.[3]

---

[2]The opinion also rejected Ms. M.'s argument that the hearing officer had erred in evaluating the IEP as it stood in February 2002 rather than June 2001 and found that, in any case, that distinction was irrelevant because both IEPs provided K.M. with FAPE. We do not address either of these conclusions.

[3]The district court held that compensatory education was not available to Ms. M. because her claim depended on challenging the content of K.M.'s fourth and fifth grade IEPs, rather than the implementation of those IEPs.

## III.

In 1997, Congress significantly amended IDEA and, in the process, clarified the circumstances in which parents who unilaterally remove their children from private school may receive tuition reimbursement.  Pub. L. No. 105-17, 111 Stat. 37 (1997). That amendment is discussed in our recent opinion <u>Greenland Sch. Dist.</u> v. <u>Amy N.</u>, Nos. 03-1668, 03-1697, 2004 U.S. App. LEXIS 3237 (1st Cir. Feb. 23, 2004).  As part of those amendments, Congress provided that:

> The cost of reimbursement . . . may be reduced or denied [] (I) if (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in division (aa).

20 U.S.C. § 1412(a)(10)(C)(iii); <u>Rafferty</u> v. <u>Cranston Pub. Sch. Comm.</u>, 315 F.3d 21, 27 (1st Cir. 2002).

There is no dispute that Ms. M. did not satisfy this notice requirement and that, under normal circumstances, the hearing officer would by statute be entitled to deny the equitable remedy of tuition reimbursement.  See <u>Rafferty</u>, 315 F.3d at 27; <u>Greenland</u>, 2004 U.S. App. LEXIS 3237, at *23-*32.  Ms. M. argues,

however, that the notice requirement was not applicable here because she fits within both the illiteracy exception and the exception for the school district's failure to provide § 1415 notice:

> Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement may not be reduced or denied for failure to provide such notice if -- (I) the parent is illiterate and cannot write in English . . . or (IV) the parents had not received notice, pursuant to [20 U.S.C. § 1415], of the notice requirement in clause (iii)(I).

20 U.S.C. § 1412(a)(10)(C)(iv).

Starting with the illiteracy exception, Ms. M. argues that the district court erred in relying on several letters that she wrote to the PET because those letters only demonstrated "the mere capability to copy words and sentences composed by another person." She argues that the evidence established that she reads only at a third grade level and was only able to write the letters sent to the PET by copying into her own handwriting letters composed by someone else.

Although Ms. M. frames her argument as a question of law, her objection is fundamentally to the factual determination that she is not illiterate. Neither the hearing officer nor the district court concluded as a matter of law that an individual with no understanding of written words who can merely copy an existing document is literate under § 1412(a)(10)(C)(iv). Instead, the district court merely held that while Ms. M. may have difficulty

-11-

reading and writing, the hearing officer correctly determined as a factual matter that she was not illiterate. Because this is a factual determination, our review is for clear error on the record as a whole. Gonzalez v. P.R. Dep't of Educ., 254 F.3d 350, 352 (1st Cir. 2001); Kathleen H. v. Mass. Dep't of Educ., 154 F.3d 8, 13 (1st Cir. 1998).

It was not clearly erroneous for the district court to conclude that Ms. M. is not illiterate. The district court's holding did not rest alone on the letters that Ms. M. signed. Ms. M. is a high school graduate, and while K.M.'s teachers knew that she had difficulty writing, they had "no indication that she was unable to read." Ms. M. also completed the written application to Aucocisco, which the hearing officer concluded "containe[d] well-formed words and language that is clear, despite some grammatical errors." Finally, when Ms. M. enrolled K.M. in kindergarten, she filled out a school questionnaire in her own handwriting in which she indicated that she read stories to K.M.

As to the second exception for parents who have not been informed of IDEA's prior notice requirement pursuant to 20 U.S.C. § 1415(d), there was no error. Ms. M. admits that she received notices of her procedural obligations during the months preceding the June 2001 PET meeting, but she says the school system failed to establish that those notices complied with the 1997 Amendments to IDEA and were not earlier versions of the school's standard forms.

Though the precise forms were not put in evidence, there was testimony that the standard forms were updated by November 2000. This was well before Ms. M. received her final procedural-safeguards notice: Ms. M. said that she had received procedural-safeguards notices for "most of the PETs during K.M.'s fifth grade year." One of those meetings was on May 9, 2001, and another on July 13, 2001.

Stressing that the language of the statute permits some discretion as to tuition reimbursement even in the absence of notice by parents whose children are receiving special education in public schools, Ms. M. argues that the decision to deny her tuition reimbursement was unfair because she made at most an "innocent mistake." Even before the 1997 Amendments, parents who acted unilaterally did so at their own financial risk. Burlington Sch. Comm. v. Dep't of Educ. of Mass., 471 U.S. 359, 373-74 (1985). The 1997 Amendments tightened up the circumstances under which reimbursement was to be allowed. See Greenland, 2004 U.S. App. LEXIS 3237, at *24-*26. There was no abuse of discretion. The evidence established that Ms. M. failed to return two different phone calls by Barbara Dee in which Dee was attempting to set up meetings during the summer. Rather than return these calls and explain her intent to remove K.M. from private school, Ms. M. removed K.M. without notifying the school and giving it an opportunity to respond. She had the assistance of an advocate who

knew the field, as well as her brother.  The equities on the notice issue do not favor Ms. M.

In a final effort to avoid the consequences of failing to follow IDEA's prior notice requirement, Ms. M. refashions her claim for tuition reimbursement as a claim for compensatory education stemming from the allegedly deficient education that K.M. received in fourth and fifth grade.[4]  But her attempt to circumvent the statutory notice requirement for tuition reimbursement fails.  The facts of this case bring it directly within the terms of the limitation on reimbursement contained in the 1997 Amendments.  Given that Congress has imposed statutory restrictions on the equitable remedy of tuition reimbursement that are directly applicable here, allowing Ms. M. to pursue a compensatory education claim for tuition reimbursement would undercut the statute.

Moreover, when this court has used the term "compensatory education," it has usually assumed that the remedies available involve prospective injunctive relief, which would not encompass tuition reimbursement.  See, e.g., Me. Sch. Admin. Dist. No. 35 v. R., 321 F.3d 9, 18 (1st Cir. 2003) (compensatory education entitles recipient "to further services, in compensation for past

---

[4]The hearing officer in this case did, in fact, find that Ms. M. was entitled to compensation for certain deficiencies in K.M.'s fifth grade IEP, and ordered the school to reimburse Ms. M. for the costs of private tutoring K.M. received and that should have been provided for free by the school.  The school district does not appeal this holding.

-14-

deprivations, even after his or her eligibility [for special education services under IDEA] has expired"); <u>Pihl</u> v. <u>Mass. Dep't of Educ.</u>, 9 F.3d 184, 188 (1st Cir. 1993); <u>see also</u> <u>G.</u> v. <u>Fort Bragg Dependent Schs.</u>, 343 F.3d 295, 309 (4th Cir. 2003) ("Compensatory education involves discretionary, prospective, injunctive relief . . . .").

Given our holding that tuition reimbursement, the only remedy Ms. M. seeks, is not available here as a form of compensatory education, we need not determine when claims of compensatory education are generally cognizable.[5]

**IV.**

The judgment of the district court is **<u>affirmed</u>**. No costs are awarded.

---

[5]At least one court has held that the compensatory education remedy is limited to challenges to the implementation of the IEP -- such as when the school system fails to provide the services set forth therein -- and does not apply to a second category of claims challenging the content of past IEPs. <u>See</u> <u>Rome Sch. Comm.</u> v. <u>Mrs. B.</u>, No. 99-CV-20-B, 2000 U.S. Dist. LEXIS 2949, at *39 (D. Me. Mar. 8, 2000). Ms. M.'s claim is not that Portland failed to provide the services specified in the fourth and fifth grade IEPs, or that it otherwise failed to implement those IEPs appropriately. Rather the claim appears to fit in the second category -- that the results of the IEPs were unsatisfactory because their content was somehow flawed. We do not decide the point.