**FRANK G. and Dianne G., Parents of a Disabled Student, Anthony G., Plaintiffs–Appellees,**

v.

**BOARD OF EDUCATION OF HYDE PARK, Central School District, Defendant–Appellant.**

**Docket No. 04–4981–CV.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 3, 2005.

Decided: July 27, 2006.

Mark I. Reisman, P.C., Ossining, NY, for plaintiffs-appellees.

James P. Drohan, Donoghue, Thomas, Auslander & Drohan, (Daniel Petigrow, on the brief), Hopewell Junction, NY, for defendant-appellant.

Before POOLER, SOTOMAYOR, Circuit Judges, and KORMAN, District Judge.*

KORMAN, District Judge.

This appeal arises out of the efforts of the parents of a learning disabled child to obtain reimbursement for the private school tuition they incurred as a result of the failure of a local educational agency to provide him with a free appropriate public education. Specifically, defendant-appellant Board of Education of Hyde Park Central School District ("School District") appeals from a judgment of the United States District Court for the Southern District of New York (Brieant, J.) finding that the School District had failed to provide the learning disabled child of plaintiff-appellees Frank and Dianne G. a free appropriate public education as defined under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 et seq. The School District argues that the district court erred in awarding plaintiff's reimbursement for tuition and attorneys' fees because, under the IDEA, Anthony's enrollment in private school was not appropriate and because the IDEA, 20 U.S.C. § 1412(a)(10)(C), permits reimbursement only where a child has previously received special education and related services. For the reasons stated below, we disagree with the School District's arguments and affirm the decision of the district court.

## FACTUAL BACKGROUND

Frank and Diane G. are the adoptive parents of Anthony, who was born to a crack-addicted mother on May 21, 1991. Since the age of three, Anthony has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). During the 1997–98 school year, Anthony attended

* The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

kindergarten at the Randolph School, a private school in Wappingers Falls, New York. From 1997 to 2001, Anthony completed first through fourth grade at Bishop Dunn School, a private school in Newburgh, New York. While Anthony did well at Bishop Dunn initially, as he progressed from first through fourth grade, his performance worsened in relation to the increasingly challenging academic environment and bigger class sizes he faced. In April 2000, in response to notification from Anthony's parents, the Committee on Special Education ("CSE") of the School District classified Anthony as learning disabled under the IDEA, Article 89 of the New York Education Law, and Part 200 of Title 8 of the Regulations of the Commissioner of Education.

During the spring of 2001, Anthony was evaluated by School District personnel. An occupational therapy evaluation conducted on February 1, 2001, revealed deficits in visual memory and visual sequential memory skills. The evaluator recommended that Anthony receive group occupational therapy twice a week. A Key Math Assessment administered on March 9, 2001, revealed severe deficiencies in subtraction and problem solving, and below average skills in rational numbers and in areas involving multi-step applications. During an in-class behavioral assessment, Anthony was observed engaging in a significant amount of off-task behavior.

An independent neuropsychological evaluation was conducted during the spring and early summer of 2001 by Dr. Miriam Lacher. She administered a standardized individual achievement test to Anthony, during which she observed him engaging in negative self-evaluations and experiencing difficulty formulating responses, shifting tasks, absorbing directions, and taking into account the important aspects of situations. Among her detailed recommenda-

tions, Dr. Lacher recommended that Anthony receive "individualized attention and a relatively small class," concluding that "[s]ince his current class size appears too large, consider dropping [him] down to a class of 12, with an aide to assist." Dr. Lacher also noted that Anthony's social skills would be most effectively addressed in a group setting, that his teacher should "[k]eep directions brief and simple," that he would "do best in 'old fashioned' home and school settings that stress values around control and provide routine, structure, discipline, and consistency as well as warmth." She also recommended, *inter alia*, that Anthony receive occupational therapy, social skills training in a group setting, and continued counseling.

On August 8, 2001, the CSE reviewed Anthony's performance from the previous year and developed an independent education plan ("IEP") for the 2001–02 school year. The CSE recommended placement in a regular education class of 26 to 30 students at the Ralph R. Smith Elementary School ("Smith School"), a public school within the School District, as well as direct consultant teacher services for math and organizational skills, a full-time individual aide, and related services of counseling, group occupational therapy, a behavior modification program, and testing modifications. The CSE also observed that Anthony was dually enrolled at Bishop Dunn for the 2001–2002 school year.

On August 10, 2001, Diane G. wrote to the School District and requested an impartial hearing to reconsider the CSE's recommendation that Anthony receive special education services at the Smith School and asked that the CSE instead provide these services at Bishop Dunn. She emphasized that the Smith School's class size of 25 students or more would not be appropriate for Anthony, a position consistent with recommendations provided by Antho-

ny's teachers and therapists. This letter had the effect of initiating a hearing before an Impartial Hearing Office ("IHO"), which took place over the course of four days between November 1 and December 13, 2001. In the meantime, Anthony's parents enrolled him at the Upton Lake Christian School ("Upton Lake"), a parochial school in Clinton Corners, New York, instead of Bishop Dunn. At Upton Lake, Anthony repeated fourth grade in a regular education class of 14 students.

The School District's initial position before the IHO was that Anthony's placement at the Smith School was appropriate and that the unilateral placement at Upton Lake was not appropriate. After one of its own witnesses testified that the class size and program it offered to Anthony was not appropriate, the School District conceded that the placement offered to Anthony at the Smith School was not appropriate. This left the School District with the defense that the Upton Lake placement was equally inappropriate and that it was not required to bear the expense of educating him there.

On February 22, 2002, the IHO accepted the concession of the School District that it "has failed to offer A[nthony] a free and appropriate public education." The IHO also agreed with Anthony's parents that he "needs a small structured classroom setting with an aid to assist him." Nevertheless, the IHO agreed with the School District that Upton Lake was not an appropriate placement for Anthony and concluded that the School District was not required to reimburse plaintiffs for his tuition. Specifically, the IHO found that the placement of Anthony at Upton Lake was inappropriate because he was not making academic or social progress there. This conclusion was based on the fact that Anthony was inattentive in class, he received "needs improvement" in English, bible, history, and science; "needs improvement" in behavior; and unsatisfactory grades in reading and math on his Five Week Progress Report. In addition, Anthony's first grading period report card demonstrated that Anthony needed improvement in math, language arts, penmanship, spiritual growth, social growth, and independent work, and that he received unsatisfactory grades in reading worksheet activities, applying spelling skills to writing, and work and study habits. Nevertheless, the IHO ordered the School District to provide consultant teacher services, counseling, occupational therapy, and a one-to-one aide to Anthony at Upton Lake. The IHO's decision was based on evidence received through December 13, 2001.

Both parties filed an administrative appeal of the IHO's ruling to the State Review Officer ("SRO"). On the appeal, the School District "conceded that the regular education class placement recommended by its CSE did not appropriately address the student's needs" and it did "not challenge ... the hearing officer's finding that it failed to offer" Anthony a free appropriate public education. On March 20, 2003, the SRO affirmed both the IHO's order denying tuition reimbursement and the order requiring the School District to provide Anthony a direct consultant teacher and a one-to-one aide at Upton Lake. In concluding that Upton Lake was inappropriate, the SRO emphasized that Anthony's academic performance during the first and second quarters of 2001–2002 continued to be poor and that, while Upton Lake "appeared to address some of [Anthony's] organizational and social needs, it did not adequately address his deficits in math, written expression, and handwriting." Moreover, he also observed that Upton Lake provided Anthony "with accommodations, not specialized instruction in his main areas of need." The SRO did not

consider evidence of Anthony's performance at Upton Lake during the third and fourth quarters of the 2001–02 academic year.

On July 18, 2003, plaintiffs filed a complaint in the Southern District of New York seeking tuition reimbursement for the 2001–02 school year. After a bench trial, Judge Brieant held that, in light of the additional evidence adduced at trial, Upton Lake was an appropriate placement for Anthony. Although mindful that a district court should defer to an SRO's educational experience, Judge Brieant emphasized that his decision was "not based solely on the evidence before the SRO," but was informed by additional evidence of Anthony's progress, including testimony of Anthony's social and behavioral development, his Stanford Achievement Test results, and his year-end grades. Anthony's teacher testified that during the second half of the year at Upton Lake, Anthony had "continued to make steady progress. He gained in emotional stability. He gained in the ability to work independently. He improved his grades tremendously." Moreover, the record before the SRO did not contain evidence of Anthony's "phenomenal" results from the Stanford Achievement Test, including evidence that Anthony completed the test without any special accommodations, and that he had scored below average in only two subcategories under math procedure and one subcategory under reading comprehension, while scoring average or above average in every other category and subcategory, including reading vocabulary, reading comprehension, mathematics problem-solving, mathematics procedure, language, spelling, study skills, science, social science, listening, using information and thinking skills. Finally, the SRO did not have the benefit of Anthony's grades from the final two marking periods. As noted by Judge Brieant (and reflected in Anthony's final report card), Anthony's grades "increased in every subject with the exception of spelling from the first to the fourth marking period. Most notably, his grade in math increased from a 63 to a 91 and his reading grade increased from a 67 to a 91."

While Judge Brieant acknowledged that Upton Lake had neither provided Anthony with an individual aide nor with direct consultant teacher services, he was satisfied that Anthony's teacher, Ms. Linda Fredericks, had worked with Anthony individually when possible, and that "she also made certain testing and other academic modifications for Anthony to assist him in successfully completing his assignments." He also noted that, as Anthony progressed over the course of the year, the need for individual attention lessened. Concluding that the facts from the administrative record and the trial demonstrated that "Anthony made meaningful academic and social progress and received educational benefit," Judge Brieant awarded tuition reimbursement to plaintiff-appellees in the amount of $3,660.00. He noted that, while the SRO had not addressed whether equitable considerations would prohibit an award of tuition reimbursement, there was no evidence on the record to disturb the IHO's finding "that the equities favored tuition reimbursement" if on appeal it is found that the parent's placement is appropriate. Judge Brieant also awarded attorneys' fees in the amount of $34,567.00, or $10,903.13 less than the total amount requested by the parents, while expressing concern over the total expenses of the litigation in light of the relatively small tuition sum sought and awarded.

The School District appeals from the judgment entered by Judge Brieant. It argues that the private school education for which reimbursement was sought was not an appropriate placement, that the dis-

trict court failed to accord appropriate deference to the administrative findings, that equitable circumstances do not warrant an award and that the district court abused its discretion both in considering additional evidence and in determining the attorney fee award. The School District also argues that the 1997 amendments to the IDEA, 20 U.S.C. § 1400 et *seq.*, established a threshold requirement that a disabled child must have previously received public special education and related services in order to be eligible for reimbursement and that plaintiffs have failed to satisfy that requirement.

## *DISCUSSION*

■ Congress enacted the IDEA to promote the education of children with disabilities, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs [and] ... to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1); *see Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 367, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A free appropriate public education "must include 'special education and related services' tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (internal citation omitted).

■ The key element of the IDEA is the development of an IEP for each handicapped child, which includes "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Burlington*, 471 U.S. at 368, 105 S.Ct. 1996. The IEP is collaboratively developed by the parents of the child, educators, and other specialists. 20 U.S.C. § 1414(d)(1)(B); *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). New York has set forth regulations to implement the goals of the IDEA, which "appear to track the IDEA closely." *Bd. of Educ. v. O'Shea*, 353 F.Supp.2d 449, 454 (S.D.N.Y.2005); *see* N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1 *et seq.* "In developing a particular child's IEP, a [Committee on Special Education] is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Walczak*, 142 F.3d at 123 (citing N.Y. Comp.Codes R. & Regs. tit. 8 § 200. 1(kk)(2)(i) (1997)).

■ If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state. *Burlington*, 471 U.S. at 370, 105 S.Ct. 1996; *M.S. ex rel. S.S. v. Bd. of Educ.*, 231 F.3d 96, 102 (2d Cir.2000). In determining whether parents are entitled to reimbursement, the Supreme Court has established a two pronged test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs. *See Burlington*, 471 U.S. at 370, 105 S.Ct. 1996; *see also Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12–13, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). Moreover, because the authority to grant reimbursement is discretionary, "equitable considerations [relating to the reasonableness of the action taken by the parents] are rele-

vant in fashioning relief." *Burlington*, 471 U.S. at 374, 105 S.Ct. 1996; *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir.2000); 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

 Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate, even if the proposal in the IEP is inappropriate. *M.S.*, 231 F.3d at 104. Nevertheless, parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education. *See* 20 U.S.C. § 1401(9). An appropriate private placement need not meet state education standards or requirements. *Carter*, 510 U.S. at 14, 114 S.Ct. 361. For example, a private placement need not provide certified special education teachers or an IEP for the disabled student. *Id.* In addition, parents "may not be subject to the same mainstreaming requirements as a school board." *M.S.*, 231 F.3d at 105 (citing *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 84 (3d Cir.1999) (holding that "the test for the parents' private placement is that it is appropriate, and not that it is perfect")).

 Subject to the foregoing exceptions, the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement. Ultimately, the issue turns on whether a placement—public or private—is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 105 (2d Cir.1998). While the IDEA does not require states to "maximize the potential of handicapped children," *Rowley*, 458 U.S. at 213, 102 S.Ct. 3034, it must

provide such children with "meaningful access" to education, *Walczak*, 142 F.3d at 133. With these goals in mind, we have held that for an IEP to be reasonably calculated to enable a child to receive an educational benefit, it must be "likely to produce progress, not regression." *Id.* at 130 (quoting *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir.1997)). Courts must, therefore, "examine the record for any 'objective evidence' indicating whether the child was likely to make progress or regress under the proposed plan." *Id.* (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir.1997)). Thus, "in the regular classrooms of a public school system, the achievement of passing marks and regular advancement from grade to grade will be one important factor in determining educational benefit." *Rowley*, 458 U.S. at 207 n. 28, 102 S.Ct. 3034; *see also Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93 (2d Cir.2003) (noting that "[p]assing grades are ... often indicative of educational benefit"). Although it is more difficult to assess the significance of grades and regular advancement outside the context of regular public classrooms, these factors can still be helpful in determining the appropriateness of an alternative educational placement. *See Walczak*, 142 F.3d at 130.

 No one factor is necessarily dispositive in determining whether parents' unilateral placement is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. *See*

*Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755 (6th Cir.2001) (holding that a unilateral private placement was appropriate where, *inter alia,* class sizes were small, the student made significant educational progress, and his grades and behavior improved significantly). To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. *See M. S.,* 231 F.3d at 105 ("The test for parents' private placement is not perfection.") (internal quotation marks omitted). They need only demonstrate that the placement provides "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Rowley,* 458 U.S. at 188–89, 102 S.Ct. 3034 (internal quotation marks omitted).

With this as a backdrop, we turn to two of the principal arguments of the School District, namely, that the enrollment of Anthony at Upton Lake was not appropriate to his needs and that, because Anthony had not previously received special education and related services, his parents are not entitled to reimbursement even if Upton Lake provided him with an appropriate special education. The School District describes the latter argument as its "absolute defense."

### 1. The Appropriateness of the Upton Lake Placement

 The School District argues that, because Anthony "did not receive specialized instruction in any of his primary areas of need—written expression, handwriting, and math," Upton Lake was not an appropriate placement for him. The School District relies on *Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 523 (6th Cir.2003),

which held that a private placement was not appropriate because it had not provided the student with any of the special education services needed, even though the placement included smaller classes and the student had received better grades. The principle for which *Medina* is cited, however, is not as broad as the School District suggests. *Medina* held specifically that "a unilateral private placement cannot be regarded as 'proper under the [IDEA]' when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient." *Id.* In this case, the concession of the School District that its IEP was inappropriate came after the testimony of one of its witnesses, a teacher at the Smith School, that "a regular fifth grade class might not be best suitable" for Anthony, even with "direct consultant teacher services" and "a one-to-one aide." Instead, she recommended a combined, self-contained 22 fourth and fifth grade class in a classroom of nine students, as opposed to a regular classroom of 26–30 students, because she believed "a small class ... would be the better place for him." Moreover, the IHO also agreed that the placement of Anthony at the Smith School was deficient because of its class size, and the SRO accepted the concession of the School District that its placement was inappropriate. The small class size offered at Upton Lake was one element of the special education services necessary to address a significant deficiency in the inappropriate public school placement the School District offered Anthony, and it comes within the IDEA definition of "special education," namely, "specially designed instruction ... to meet the unique needs of a child." 20 U.S.C. § 1401(29).

We need not decide that small class size alone rendered the Upton Lake placement appropriate because Anthony's teacher at Upton Lake, Ms. Fredericks, adapted her

instruction to meet his needs. Ms. Fredericks worked with Anthony one-on-one, created a communications book, gave Anthony extra time to complete work, and allowed him to work in isolated areas of the classroom. Ms. Fredericks also adapted the methodology of instruction by allowing Anthony to take tests orally. The transcript of the hearing before the IHO includes testimony that Anthony received assistance from a volunteer teacher's assistant, who, while working with other students, spent time with Anthony, and "assist[ed] A[nthony] greatly throughout the day."

Moreover, Anthony's social and academic progress, and his score on the Stanford Achievement Test, support the appropriateness of the placement. These factors, as discussed above, indicate that the placement was reasonably calculated to enable him to receive educational benefits, especially when coupled with the adaptations made by Anthony's teacher. While the SRO, reasoning without the benefit of Anthony's final grades, had emphasized that Anthony had failed math for the first and second quarter of 2001–2002, and that Upton Lake did not address his deficits in math, Judge Brieant noted that Anthony's grade in math increased from a 63 to a 91 and his reading grade had increased from a 67 to 91.

The School District also challenges the finding of Anthony's "phenomenal" performance on the Stanford Achievement Test, noting that "no supplemental evidence offered at trial established any baseline from which to draw this comparison." This argument ignores the testimony at trial that Anthony was given a portion of the Stanford Achievement Test as a placement exam in August 2001, prior to his enrollment at Upton Lake, that he was unable to complete any problems in the math section, and that he completed only

"a few" reading comprehension problems and that he was unable to write anything. Anthony's answers to this exam, and the test material itself, were entered as exhibits at trial. Contrary to the claim of the School District, this evidence provides a useful measure by which to compare Anthony's subsequent performance on the entire exam eight months later, whereupon he performed in the average or above average range in every subject except for three subcategories in mathematic procedures and reading comprehension.

The School District relies on *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26–27 (1st Cir.2002), for the proposition that "[e]ven if the child makes academic progress at the private school, 'that fact does not establish that such a placement comprises the requisite adequate and appropriate education.'" In *Rafferty*, parents of a child who had difficulty reading sought reimbursement for their child's unilateral placement in a reading clinic where she "spent four to five hours a day, five days a week alone with a clinician working on reading" but "did not study *any* other subjects, such as social studies, math, English, or science." *Id.* at 26 (emphasis added). Because of the absence of instruction in any subject but reading, *Rafferty* held that the child's demonstrated progress in reading, while not surprising, was insufficient to demonstrate that her placement was appropriate. *Id.* at 26–27. *Rafferty* is plainly distinguishable on its facts from the present case because Anthony studied a wide range of academic subjects at Upton Lake.

Nor is this a case in which Anthony's progress can be attributed reasonably to "mere happenstance." *Medina*, 348 F.3d at 522 n. 6. Anthony was provided with a small class size, which everyone agreed was critical, and his program was specially designed to accommodate his needs. The progress he made was more likely attrib-

uted to these factors than to "mere happenstance." Indeed, the IHO and SRO did not find Anthony's placement at Upton Lake inappropriate because the progress he made was "mere happenstance." Instead, they relied in significant part on the fact that, as of December 13, 2002, Anthony was doing poorly at Upton Lake and evidence suggested a lack of progress.

If Judge Brieant had reached the opposite conclusion based on the same record, we would likely not affirm that decision because "[a]n assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where ... the district court's decision was based solely on the record that was before the SRO." *M. S.*, 231 F.3d at 105. Judge Brieant, however, was able to rely on evidence that was not available to the SRO to conclude that Anthony had made significant progress. This progress, viewed together with small class size and the program offered at Upton Lake, is sufficient to support Judge Brieant's judgement that Anthony received an education "reasonably calculated to enable the child to receive educational benefits." *Knable*, 238 F.3d at 770. In reaching this conclusion, Judge Brieant recognized the deference to which the judgement of the SRO is generally entitled and he correctly applied the rule that, when reviewing administrative decisions, federal courts "must base their decisions on 'the preponderance of the evidence,' taking into account the evidence in the administrative record *and* 'any further evidence presented before the District Court by the parties.'" *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d. Cir.2003) (citing 20 U.S.C. § 1415(i)(2)(B)).

## 2. The School District's "Absolute Defense"

The School District argues that it has "an absolute legal defense" to Anthony's

parents' claim for reimbursement, even if Upton Lake provided him with an appropriate public education. This defense is based on one of the 1997 amendments to the IDEA, 20 U.S.C. § 1412(a)(10)(C)(ii), which the School District argues, "established a statutory threshold for parents to recover tuition reimbursement when enrolling their child in a private school without the consent of the school district." Specifically, it argues that it may deny reimbursement to the parents of disabled students who had enrolled them in regular public or private schools prior to the emergence of the need for a free appropriate public education to meet their unique needs. Only after a learning disabled student enrolled in an inappropriate special education program offered by a public agency would his parents be free unilaterally to enroll him at an appropriate private school and seek reimbursement. Because Anthony never received special education and related services from a public agency prior to his enrollment at Upton Lake, the School District argues, his parents are not entitled to reimbursement for his tuition there.

The justification offered for this argument is the assertedly plain language of 20 U.S.C. § 1412(a)(10)(C)(ii) which authorizes reimbursement to the parents of a disabled child, "who previously received special education and related services under the authority of a public agency" and who enrolled the child in a private elementary or secondary school without the consent or referral of the private agency, "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii). Because the authority granted by this subsection applies to the reimbursement of parents of

disabled children, "who previously received special education and related services under the authority of a public agency," the School District argues that it should be read as implicitly excluding reimbursement to parents who enrolled their child in a public or private school before the need for a free appropriate special education manifested itself. "The clear implication of the plain language, however, is that where a child has *not* previously received special education from a public agency, there is no authority to reimburse the tuition expense arising from a parent's unilateral placement of the child in private school." *Bd. of Educ. v. Tom F.*, 2005 WL 22866, at *3 (S.D.N.Y. Jan. 4, 2005). We disagree.

As in all statutory interpretation cases, we begin with the language of the statute. Our first task "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). Our inquiry ends, if the language of the statute is unambiguous and "the statutory scheme is coherent and consistent," unless the case comes within the category of cases in which the result reached by applying the plain language is sufficiently absurd to override its unambiguous terms. *Id.* at 450, 459, 122 S.Ct. 941 (internal quotation marks and citation omitted); *United States v. X-Citement Video Inc.*, 513 U.S. 64, 69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). If, however, the terms of a statute are ambiguous, "we resort to the canons of statutory construction to help resolve the ambiguity." *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir.2006). More-

over, while the Supreme Court has said that it "rarely" invokes the need to avoid an absurd result to override the plain language of a statute, *Barnhart*, 534 U.S. at 459, 122 S.Ct. 941, we have long held that where a statute is ambiguous, it "should be interpreted in a way that avoids absurd results." *See, e.g., United States v. Dauray*, 215 F.3d 257, 264 (2d Cir.2000).

Whether a statute is plain or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). We have applied a similar approach in determining whether a provision of a contract is ambiguous. Specifically, we have held that "[l]anguage is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *O'Neil v. Retirement Plan for Salaried Employees of RKO, Inc.*, 37 F.3d 55, 59 (2d Cir.1994) (internal quotations omitted).

The plain language of 20 U.S.C. § 1412(a)(10)(C)(ii) does not say that tuition reimbursement is *only* available to parents whose child had previously received special education and related services from a public agency, nor does it say that tuition reimbursement is not available to parents whose child had not previously received special education and related services. Indeed, the School District's need to rely on an inference to be drawn from the plain language, rather than the language itself, suggests a degree of ambiguity that would not necessarily be present if § 1412(a)(10)(C)(ii) was the only section of the IDEA that spoke to the issue of the remedy that a district court may award. This section, however, is not the only sec-

tion or even the principal section of the IDEA that speaks to this issue.

Another section of the IDEA, 20 U.S.C. § 1415(i)(2)(C), authorizes a district court hearing a challenge to the failure of a local education agency to provide a free appropriate public education to "grant such relief as [it] determines is appropriate." In *Burlington*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385, the Supreme Court held that the identically worded predecessor of this section, 20 U.S.C. § 1415(e)(2) (1984), authorized the equitable remedy of tuition reimbursement to parents who had enrolled their disabled child in a private school while they successfully litigated the issue of the inappropriateness of his public placement. Then–Justice Rehnquist explained the reasoning of the decision as follows:

> The statute directs the court to "grant such relief as [it] determines is appropriate." The ordinary meaning of these words confers broad discretion on the court. The type of relief is not further specified, except that it must be "appropriate." Absent other reference, the only possible interpretation is that the relief is to be "appropriate" in light of the purpose of the Act. As already noted, this is principally to provide handicapped children with "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as non-handicapped children, but the Act also provides for placement in private schools at public expense where this is not possible. *See* § 1412(5); 34 CFR §§ 300.132, 300.227, 300.307(b), 300.347 (1984). In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that "appropriate" relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school.

*Burlington*, 471 U.S. at 369–70, 105 S.Ct. 1996.

Prospective relief alone is not a sufficient remedy because the process of obtaining the relief "is ponderous" and a "final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed." *Id.* at 370, 105 S.Ct. 1996. Under these circumstances, "it would be an empty victory to have a court tell [parents who placed their child in a private school] several years later that they were right," yet deny them reimbursement for the placement. *Id.* "If that were the case," Justice Rehnquist concluded, "the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement as an available remedy in a proper case." *Id.*

The language of § 1415(e)(2), upon which *Burlington* relied, was unchanged by the 1997 revision of the IDEA and continues to provide that the court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The re-enactment of § 1415(e)(2), without change, is significant because it can be presumed that Congress intended to adopt the construction given to

it by the Supreme Court and made that construction part of the enactment. *Shapiro v. United States,* 335 U.S. 1, 16, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 500, 53 S.Ct. 721, 77 L.Ed. 1331 (1933). Whether 20 U.S.C. § 1412(a)(10)(C)(ii), upon which the School District relies, was intended to eliminate the power of a district court to grant the relief to which Anthony's parents would otherwise be entitled, involves a question to which the IDEA does not provide an unambiguous answer. Indeed, the assertedly "clear implication of the plain language" of § 1412(a)(10)(C)(ii), *Tom F.,* 2005 WL 22866, at *3, is inconsistent with the clear implication of § 1412(a)(10)(C)(i), which in relevant part provides that the obligation of a state to offer a free appropriate education "does not require a local educational agency to pay for the cost of education . . . of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." The implication of this subsection is that reimbursement is available where, as here, the agency failed to make a free public education available to the child. *See Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.,* 373 F.Supp.2d 402, 414 (S.D.N.Y.2005) ("Subsection (i), read alone, suggests that the failure of a district to make a [free appropriate public education] available to a student in the first instance would entitle the parents to reimbursement even if the child had not previously received services.").

■ Under these circumstances, we think it is hardly clear from the fact that § 1412(a)(10)(C)(ii) provides for parental reimbursement in one circumstance, that it excludes reimbursement in other circumstances. Our conclusion is supported by the cases in which a party relies on the Latin maxim *"expressio unius est exclusio alterius,"* that the express statutory mention of certain things impliedly excludes others not mentioned. The School District may not invoke this maxim here, because it "applies only when the statute identifies a series of two or more terms or things that should be understood to go hand in hand, thus raising the inference that a similar unlisted term was deliberately excluded." *United States v. City of New York,* 359 F.3d 83, 98 (2d Cir.2004) (internal quotation marks and citation omitted). Nevertheless, even where the maxim is otherwise applicable, the Supreme Court has not treated as conclusive the inference that Congress intended to exclude that which it did not explicitly include. Instead, it has treated the maxim "as but an aid to construction." *Sec. & Exch. Comm'n v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351 n. 8, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Indeed, only recently the Supreme Court held that "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003).

■ Where, as here, the terms of a statute are ambiguous, we turn to the "traditional canons of statutory construction to resolve the ambiguity." *United States v. Peterson,* 394 F.3d 98, 105 (2d Cir.2005). "Although the canons of statutory interpretation provide a court with numerous avenues for supplementing and narrowing the possible meaning of ambiguous text," *Nat'l. Res. Def. Council v. Muszynski,* 268 F.3d 91, 98 (2d Cir.2001), several rules are particularly helpful in interpreting the statutory provision at issue in this case. Where the terms of a statute are ambiguous, we "focus upon the 'broader context'

and 'primary purpose' of the statute." *Can. Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG,* 335 F.3d 52, 57 (2d Cir.2003) (quoting *Castellano v. City of New York,* 142 F.3d 58, 67 (2d Cir.1998)) (citations omitted); *see also Nat'l. Res. Def. Council,* 268 F.3d at 98 ("[W]hen determining which reasonable meaning should prevail, the text should be placed in the context of the entire statutory structure."). Ultimately, as Justice Jackson observed, "courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." *Joiner,* 320 U.S. at 350–51, 64 S.Ct. 120; *see also Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) ("[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.") (Hand, L., J.) (quoted with approval in *Pub. Citizen,* 491 U.S. at 455, 109 S.Ct. 2558).

 A second and related rule of statutory construction is that the meaning of an ambiguous statutory provision is "clarified by the remainder of the statutory scheme ... [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 217–18, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (quoting *United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). The rule is particularly applicable here, because the issue involves an ambiguity created by the tension between different sections of the IDEA rather than the interpretation of an ambiguous word or phrase.

Applying these rules in the present case, we again observe that the express purpose of the IDEA is to ensure that a free appropriate public education is "available to all children with disabilities." Indeed, the IDEA is the legislative centerpiece of "an ambitious federal effort to promote the education of handicapped children." *Voluntown,* 226 F.3d at 62 (quoting *Walczak,* 142 F.3d at 122). Its central purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B). The IDEA also provides that a state's eligibility for IDEA funding is that it make available "free appropriate public education ... to all children with disabilities." 20 U.S.C. § 1412(a)(1).

One of the primary ways in which the IDEA seeks to ensure that children with disabilities receive a free appropriate education is by conferring broad discretion on the district court to grant relief it deems appropriate to parents of disabled children who opt for a unilateral private placement in cases where the parents' placement is determined to be proper and the proposed IEP is determined to be inadequate. *See* 20 U.S.C. § 1415(i)(2)(C)(iii). While the manner in which the authority is exercised may be guided by the various subsections of § 1412(a)(10), which mainly codified existing law in significant respect, *Voluntown,* 226 F.3d at 69 n. 9, nothing in the legislative history (to be discussed shortly) suggests that Congress sought to alter

prior law in a manner that would constrain the power of a district court judge to award reimbursement for a private placement where a free appropriate public education had not been provided under the circumstances here.

The Supreme Court has also instructed us that, because "[t]he [IDEA] was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *Burlington*, 471 U.S. at 372, 105 S.Ct. 1996; *Carter*, 510 U.S. at 12–13, 114 S.Ct. 361; *see also Still v. DeBuono*, 101 F.3d 888, 893 (2d Cir.1996). The construction of the § 1412(a)(10)(C)(ii) that the School District urges upon us would defeat both purposes of the IDEA. The construction we adopt is the only one that "produces a substantive effect that is compatible with the rest of the law." *Cleveland Indians Baseball Co.*, 532 U.S. at 217–18, 121 S.Ct. 1433 (quoting *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 371, 108 S.Ct. 626).

This brings us to the last rule of statutory construction applicable here. This rule, as we previously observed, is that ambiguous statutes are to be construed so as to avoid absurd results. The School District's interpretation of 20 U.S.C. § 1412(a)(10)(C)(ii) would produce such results. It would, for instance, prevent children who are provided with inadequate IEPs from receiving a free appropriate public education if their disabilities were detected before they reached school age. It would also place the parents of children with disabilities in the untenable position of acquiescing to an inappropriate placement in order to preserve their right to seek reimbursement from the public agency that devised the inappropriate placement. Such a result, it has been suggested, "ensures that a parent's rejection of a public school placement is not based on mere speculation as to whether the recommended school placement would have been appropriate." *Tom F.*, 2005 WL 22866, at *3. This suggestion turns on the erroneous assumption that parents would have to keep their child in a public school placement until it was clear that their "speculation" was borne out by a wasted year of actual failure. Such a "first bite" at failure is not required by the IDEA. All that is required of parents who have received an IEP for their child is that they provide the appropriate public agency with reasonable notice that they plan to "reject [ ] the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa)-(bb). Because such notice was provided here, Anthony's parents would have been free to enroll him in a private school if they had enrolled him first in the Smith School as provided in the IEP and then removed him thereafter.

We believe that it is unreasonable to suggest that Anthony's parents were legally required to engage in such a useless and potentially counterproductive exercise, given Anthony's "need for constant and consistent care, even brief periods of inappropriate schooling could lead to tremendous educational, social, emotional, and psychological deterioration." *Connors v. Mills*, 34 F.Supp.2d 795, 804 (N.D.N.Y.1998). We decline to interpret 20 U.S.C. § 1412(a)(10)(C)(ii) to require parents to jeopardize their child's health and education in this manner in order to qualify for the right to seek tuition reimbursement.

Our interpretation is consistent with that of the Department of Education's Office of Special Education & Rehabilitative

Services. Specifically, the agency wrote in response to an inquiry:

> In our view, it does not appear that this question presented by your query— namely, whether actual receipt of some form of special education and related services from a public agency is a prerequisite for a parent's ability to seek tuition reimbursement for all or part of the cost of their child's unilateral private school placement—is answered by § 612(a)(10)(C) [20 U.S.C. § 1412(a)(10)(C) ] of IDEA '97. We do not view § 612(a)(10)(C) [20 U.S.C. § 1412(a)(10)(C) ] as foreclosing categorically an award of reimbursement in a case in which a child has not yet been enrolled in special education and related services under the authority of a public agency. Reimbursement is an equitable remedy that courts and hearing officers may order in appropriate circumstances. In such a case, a parent may wish to avail him or herself of due process and judicial action, so that a hearing officer or court can determine whether there has been a denial of [a free appropriate public education], and, if so, whether and to what extent tuition reimbursement would be warranted.

Letter to Susan Luger, listed in 65 Fed. Reg. 9178 (Feb. 23, 2000) and reprinted in 33 I.D.E.L.R. 126 (March 19, 1999). While the interpretation comes in the form of an informal letter, deference to a policy letter may be appropriate where the statutory language is ambiguous. *Honig,* 484 U.S. at 325 n. 8, 108 S.Ct. 592. We have suggested that the degree of deference remains unclear. *See St. Johnsbury Acad. v. D.H.,* 240 F.3d 163, 171 (2d Cir.2001). Nevertheless, we need not resolve this issue here because we do not so much defer to the OSEP letter as we take comfort from the fact that it is consistent with our own construction of an ambiguous statute.

Contrary to the School District's argument, the legislative history does not alter our conclusion. The issue is addressed in the Report of the House Committee on Education and the Workforce. The Report begins by explaining that "[t]he bill makes a number of changes to clarify the responsibility of public school districts to children with disabilities." H.R. No. 105–95, at 92 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 78, 90. One of the changes to the IDEA is the addition of 20 U.S.C. § 1412, the purpose of which is explained as follows:

> Section 612 [20 U.S.C. § 1412] also specifies that parents may be reimbursed for the cost of a private educational placement under certain conditions (i.e., when a due process hearing officer or judge determines that a public agency had not made a free appropriate public education available to the child, in a timely manner, prior to the parents enrolling the child in that placement without the public agency's consent). Previously, the child must have had received special education and related services under the authority of a public agency.

H.R.Rep. No. 105–95, at 92 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 78, 90.

At best, this language is an awkward paraphrase of the ambiguous statutory language which refers to "the parents of a child with a disability, who previously received special education and related services under the authority of a public agency." Again, the statutory language does not expressly exclude reimbursement where special education and related services have not been previously provided, it only provides a basis for the argument that Congress implicitly excluded reimbursement in these circumstances. The district judge in *Tom* F., however, read the language in the House Report to re-

quire explicitly that the child "must" have "[p]reviously ... received" such services as a condition to the receipt of reimbursement of his parents. 2005 WL 22866, at *3. We cannot agree.

A natural reading of the word "previously," in the context of a report detailing changes to the IDEA, would suggest a reference to the IDEA's previous requirements. Thus, the first sentence of the paragraph unequivocally provides reimbursement for a private placement "when a due process hearing officer or judge determines that a public agency has not made a free appropriate public education available to the child, in a timely manner, prior to the parents enrolling the child in that placement without the public agency's consent." The second sentence explains that *"[p]reviously,* the child must have received special education and related services under the authority of a public agency." (emphasis added). To paraphrase the words of the Supreme Court in an analogous context, *Lindh v. Murphy,* 521 U.S. 320, 330, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), "[a] thoughtful Member of the Congress" reading this explanation for a change in prior law would have very likely concluded (1) that "previously," meaning prior to the proposed amendment to the IDEA, parents could receive reimbursement for a private placement only if the child received special education and related services under the authority of a public agency and (2) that the change afforded by the proposed amendment would permit funding even where the disabled child had not previously received such special education and related services. This is just the opposite of what the School District and *Tom F.* argue is the clearly expressed intent of Congress.

The House Report gives no indication that Congress intended to amend the IDEA's rules regarding tuition reimbursement. Indeed, the House Report makes no reference to prior law on the issue and expresses no intent to limit the discretion that *Burlington* vested in district courts to award reimbursement pursuant to 20 U.S.C. § 1415(i)(2)(B). Nor does it explain the reason why it attached the condition at issue here to private placement reimbursement. Indeed, the House Report is as significant for what it does not say as for what it does say.

Justice Scalia has marshaled persuasively the dangers of relying on congressional committee reports in interpreting statutes. Antonin Scalia, *A Matter of Interpretation* 19–36 (Princeton University Press, 1998). We have not accepted Justice Scalia's argument that such reports should never be resorted to in construing a statute. *See, e.g., Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 402 F.3d 332, 336–37 (2d Cir.2005). Nevertheless, the House Report in this case is of a kind that calls to mind the admonition that "[r]eliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously." *Piper v. Chris–Craft Indus. Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). We decline to take that step here and to pay any deference to the confusing explanation of the purpose of § 1412(a)(10)(c)(ii). Cf. *Gottlieb,* 436 F.3d at 337–38, (holding that resort to legislative history is appropriate only if the plain language of the statute and the canons of statutory interpretation fail to resolve an ambiguity).

This brings us to the last leg of the School District's argument—its reliance on *Greenland Sch. Dist. v. Amy N.,* 358 F.3d 150 (1st Cir.2004). *Greenland* held only that parents of a learning disabled child, who unilaterally placed their child in a private school without notice to the local educational agency of their child's need for special education and without offering the

agency an opportunity to prepare an IEP that is appropriate to the child's needs, were not eligible for tuition reimbursement. *Id.* at 159–60. Indeed, rather than simply denying the parent's claim for reimbursement on the ground that their child had not previously received special education and related services from a public agency, *Greenland* canvassed the entire statutory scheme, including § 1412(a)(10)(c)(ii), and concluded that "[t]hese statutory provisions make clear Congress's intent that *before* parents place their child in private school, they must at least give notice to the school that special education is at issue. This serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools." *Id.* at 160 (emphasis in original) (citations omitted). We do not regard *Greenland* as dispositive.

*Greenland's* discussion of 20 U.S.C. § 1412(a)(10)(C)(ii) arose from its perceived need to deal with the subsection immediately preceding it. Again, this subsection, § 1412(a)(10)(C)(i), says that a local education agency is not required to pay for the cost of education, including special education and related services, "if that agency made a free public education available to the child and the parents elected to place the child in such private school or facility." This language troubled the *Greenland* Court, because it implied that parents are entitled to reimbursement if a free appropriate public education was not provided "where, as here [in *Greenland*], the local education agency was never informed while the child was in public school that the child might require special education services." 358 F.3d at 159. This "seeming ambiguity," according to *Greenland,* "disappears when considered in light of the section's affirmative requirement that 'the parents of a child with a disability, who previously received special education and related services under the authority of a public agency' can receive reimbursement for their unilateral placement of the child in private school only 'if [a] court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.' " *Id.* (quoting 20 U.S.C. § 1412(a)(10)(C)(ii)). *Greenland* continued as follows:

> These threshold requirements are key to this case: tuition reimbursement is *only* available for children who have previously received "special education and related services" while in the public school system *(or perhaps those who at least timely requested such services while the child is in public school).* There is no dispute that neither Katie's parents nor anyone else requested an evaluation for Katie while she was at Greenland. There is also no dispute that she was removed from Greenland for reasons having nothing to do with any issue about whether Katie was receiving [a free appropriate public education].

*Id.* at 159–60 (emphasis added). The *Greenland* Court then went on to deny the parents' claim for reimbursement because of their failure to alert the School District of Katie's need for special education and related services while she was in public school. We agree completely with the result reached in *Greenland.* Indeed, we reached the same result in *Voluntown,* 226 F.3d at 68–69, without reference to § 1412(a)(10)(C)(ii).

Our problem with the analysis in *Greenland* is that it assumes that the ambiguous language of § 1412(a)(10)(C)(ii) is clear by adding the word "only" to the language of the subsection. Indeed, not a single word of the language we have emphasized in the

foregoing quote appears in the language of the subsection. This includes the suggestion that a child in public school need not have previously received "special education and related services;" the child need only have made a request for it while in a public school. Simply stated, without discussion or analysis, *Greenland* resolved the issue of the ambiguity of § 1412(a)(10)(C)(ii) by simply amending the language itself. Moreover, it did so in a way, perhaps inadvertently, that implicitly suggested an arbitrary distinction between children enrolled in a regular public school and children enrolled in a regular private school. Perhaps even more troubling is that none of this discussion was necessary, because the subdivision immediately following § 1412(a)(10)(C)(ii) makes "clear Congress's intent that *before* parents place their child in private school, they must at least give notice to the school that special education is at issue." *Greenland,* 358 F.3d at 160 (emphasis in original) (relying on 20 U.S.C. § 1412(a)(10)(C)(iii)). Indeed, the latter subsection expressly states that "[t]he cost of reimbursement described in clause (ii) may be reduced or denied," if the prescribed notice is not given, 20 U.S.C. § 1412(a)(10)(C)(iii)(I), or "upon a judicial finding of unreasonableness with respect to actions taken by the parents," 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

Separate and apart from subsection 1412(a)(10)(C)(ii), we have held that it is inequitable to permit reimbursement under the circumstances in *Greenland.* As we have observed: "[C]ourts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." *M.C.,* 226 F.3d at 68. Indeed, in *Carmel,* 373 F.Supp.2d at 417, where the district judge followed the analysis of *Greenland* as it related to § 1412(a)(10)(C)(ii), she also denied reim-

bursement on the alternative ground that "the parents are not equitably entitled to tuition reimbursement." *Id.* at 407.

Unlike the parents of the child in *Greenland,* who provided "no notice at all to the school system before Katie's removal from Greenland that there was any issue about whether Katie was in need of special education," 358 F.3d at 160, in the instant case, Anthony's parents provided the School District with ample notice that he was in need of special education and the School District evaluated his needs in 2000, when he was classified as learning disabled, and again in 2001 at the request of his parents. When the School District provided Anthony with an IEP that Anthony's parents believed was inappropriate, Anthony's parents gave timely notice of their dissatisfaction to the School District. Before his enrollment in Upton Lake, the School District had every opportunity to evaluate Anthony in the regular private school that he was attending and determine whether "a free appropriate public education can be provided in the public schools." *Id.* After forcing a hearing before an IHO, it conceded that it had failed to provide the free appropriate public education required by the IDEA. Section 1415(i)(2)(B), as construed by the Supreme Court in *Burlington,* provides an ample basis for the award of reimbursement to Anthony's parents. Section 1412(a)(10)(C)(ii) does not prohibit it.

We have considered carefully the other arguments raised by the School District and conclude that they are without merit. Accordingly, the judgment of the district court is affirmed.